

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

April 19, 2024

**BY ECF**
The Honorable J. Paul Oetken
United States District Judge
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

> Re:   *United States v. Jeremy Joseph*, 23 Cr. 68 (JPO)

Dear Judge Oetken:

The Government writes in advance of the sentencing of defendant Jeremy Joseph, which is scheduled for April 23, 2024, at 11:00 a.m.  For the reasons set forth below, the Government respectfully submits that a sentence within the applicable United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") range of 30 to 37 months' imprisonment, followed by a three-year term of supervised release, is appropriate in this case.  The requested sentence is sufficient, but not greater than necessary, to account for the factors set forth in Title 18, United States Code, Section 3553(a).

## I.   Background

### A.  Indictment and Trial

Counts One and Two of the indictment in the above-captioned action charged the defendant transmitting threatening communications in interstate commerce, in violation of 18 U.S.C. § 875(c) (the "Indictment").  Trial commenced on November 27, 2023.  Two days later, while the Government's fifth witness was on the stand, the defendant halted the proceedings and ultimately pled guilty to both counts of the Indictment.

### B.  The Offense Conduct

As set forth in the PSR, and as established at trial, in December 2022 and January 2023, the defendant sent two former colleagues—██████████ and ██████████ (collectively, the "Victims")—death threats.  (PSR ¶ 11).

These death threats detail the defendant's plan to murder each of the Victims, among others.  The December 2022 email said the defendant planned to kill ██████████ "with a bullet to the head" and to kill ██████████ "at a conference," but also stated that the defendant "had other matters at hand" for the time being.  (GX 111).  The January 2023 email then escalated the

Hon. J. Paul Oetken                                                                                    Page 2
April 19, 2024

defendant's threat, stating that the defendant had "changed his mind" and "want[ed] [them] dead."
(GX 117).  The death threats are copied, in part, below:

[External] ▮▮▮▮▮ and ▮▮▮▮▮▮▮▮ are Trash People

**DA**  ▮▮▮▮▮▮▮▮▮▮▮ Are Trash <▮▮▮▮▮▮▮▮▮▮AreTrash@proton.me>        ↩ Reply   ↩ Reply All   → Forward   ⋯
        To                                                                          Thu 12/22/2022 11:00 PM

**This is Jeremy Joseph. I don't have much to say so I'll keep it short. ▮▮▮▮▮ and ▮▮▮
▮▮▮▮▮ are disgusting fuxking human beings. I mean not only did I get PTSD after
working at Morgan Stanley - but i had to go to the hospital for GI issues which
manifested from stress then turned into other physical ailments which resulted in
shoulder surgery. I also went to therapy because of you fucking disgusting trash for
people.**
You are vile. Disgusting. Pathetic. Horrible people.

I even contemplated how to kill each of you. ▮▮▮ in NYC with a bullet to the head with a "robbery." ▮▮▮ at a conference. Of course true to your
nature, you're still horrible people. While ▮▮ was not at a conference I only had to speak to a couple of people at Loxo to hear bad shit about
you.

Ugh I felt sorry for ▮▮▮ because of what a loser he was. Genetic shit for a kid that he had with his bedridden wife and a miserable man he was
pining after a child adult ▮▮▮

You're lucky I have other matters at hand because I was waiting to kill you when it wouldn't track back to me so that each would look like isolated
incidents.

And top it off - I actively hate Jews now. Seriously. Hate them and you. I understand why the Nazis wanted you people dead now - and wish they
had finished your people off cause you fuckers need to be dead and rid of the earth. Ugh disgusting.

That is all.
Jeremy

I posted this.

https://www. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Hon. J. Paul Oetken                                                                                          Page 3
April 19, 2024

**From:** ████ and ████ To Die < ████████ ToDie@proton.me>
**Sent:** Monday, January 23, 2023 12:29 PM
**To:** ████████
**Subject:** ████████ To Die and their families and work colleagues

[EXTERNAL MESSAGE]

I've changed my mind. I want you dead and I've already bought the guns, pipe bombs, and other materials to take you out. The bombs will be placed outside your work places and the guns well - easy breezy - guns a blazing walking in.

It'll save me some time if the employees just hand you over. They'll only get bullets in their heads - an easier way out - but a way out for sheltering your bullshit.

I want you dead. There's no other option. Die you nasty jew fucks



(GX 111, 117).

     As can be seen above, these emails also included antisemitic language, photographs and intimate details about the Victims' lives, which personalized the threats.  Indeed, the January 2023 email even included open-source information regarding ████████'s purported addresses, phone numbers, and family members.

The defendant knew the Victims because, over ten years prior, the defendant worked with the Victims on a three-person team at Morgan Stanley. (PSR ¶ 9)  The defendant was discharged from his role within approximately one year. (*Id.* ¶ 9).  Despite having nearly no contact with the Victims after his departure from Morgan Stanley, he began harassing them in the summer of 2022, before sending the death threats.  In particular, in the summer of 2022, ███████████ began receiving emails regarding a Probate Court case relating to the defendant's deceased mother's estate (the "Probate Case"). (*Id.* ¶ 10).  These e-filings detailed a variety of grievances that the defendant had against the Victims and others, and also included threats and antisemitic language. For example, one filing stated: "Ive bought a gun, and I will use it if I have to against any and every one of you. . . Sleep with one eye open for the rest of your lives." (GX 4).  Several months after the defendant made these filings in the Probate Case, he sent the above death threats.

The defendant's conduct toward the Victims was part of broader pattern of conduct around the same time. (PSR ¶¶ 13-16).  The defendant also threatened other former employers, members of educational institutions he previously attended, lawyers he had previously retained, employees at a hospital that had previously treated his ill mother, and government officials, among others. (*Id.* ¶ 13).  These threats, all made by email, included bomb threats, threats of murder, antisemitic language and personal details about the defendant's victims. (PSR ¶ 39).

## C.  The Defendant's Offense Level and Criminal History Category

In the Presentence Report, dated April 16, 2024 ("PSR"), the United States Probation Office determined that the offense level is 19. (PSR ¶ 39).  This offense level includes a three-level increase because the defendant intentionally selected the Victims because of their actual or perceived religion pursuant to U.S.S.G. § 3A1.1.

The Probation Office recommended a sentence of 30 months' imprisonment, to be followed by three years of supervised release. (PSR at 22).  In making its recommendation, the Probation Office noted that the defendant's "antisemitic rants and threats of physical harm and death towards his victims has caused them unmeasurable emotional distress and anxiety." (*Id.*).  The Probation Office further stated that "[t]he aggravating circumstances of this case outweigh any potential mitigating circumstances." (*Id.*).

The defendant, who is proceeding *pro se* at sentencing, has not filed objections to the PSR or a sentencing submission in this case.

## II.     Discussion

### a.  Applicable Law

Following *United States v. Booker*, 543 U.S. 220 (2005) and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), the Guidelines continue to provide a critical touchstone.  Indeed, while the Guidelines are no longer mandatory, they remain in place, and district courts must "consult" them and "take them into account" when sentencing. *Booker*, 543 U.S. at 264.  As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating

the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After calculating the Guidelines range, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)–(7).  *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant;

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

> **b. Analysis**
>
> > **i. The Court Should Find That The Defendant Selected Victims Because of Their Actual or Perceived Religion**

The Guidelines calculation conducted by the Probation Office, to which the Government agrees, includes a three-level increase in the offense level pursuant to U.S.S.G. § 3A1.1(a).  The defendant does not object to the application of this enhancement.

The enhancement in § 3A1.1(a) provides in pertinent part: "If . . . in the case of a plea of guilty . . . the court at sentencing determines beyond a reasonable doubt that the defendant intentionally selected any victim . . . as the object of the offense of conviction because of the actual or perceived race, color, religion, national origin, ethnicity, gender, gender identity, disability, or sexual orientation of any person, increase by 3 levels."  U.S.S.G. § 3A1.1(a).

The enhancement in § 3A1.1(a) has been applied in cases, like this one, where threats targeted individuals of that were, or were perceived to be, members of one of the enumerated classes.  *See United States v. Taubert*, 801 F. App'x 41, 43 (2d Cir. 2020) (affirming application of § 3A1.1(a) in case involving threats to political officials where jury found that the defendant selected his victims on the basis of race).  Additionally, the enhancement applies even where the

Hon. J. Paul Oetken                                                                                                    Page 6
April 19, 2024

defendant may have been motivated by some goal other than hatred.  *See In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 154 (2d Cir. 2008) (holding that the enhancement in § 3A1.1(a) does not require the Court to find that the defendant was motivated by "blind, irrational hatred").

The trial evidence alone supports finding that Joseph selected the Victims based on their Jewish religion:

- *First*, Michael Devitt, the defendant's close personal friend, testified at trial that the defendant described his Morgan Stanley bosses (which included ████████████) as "Jewish" when he was complaining about them.  (Nov. 28, 2023 Tr. at 193:9-18).

- *Second*, the defendant's Probate Court filings were rife with antisemitic remarks, both in relation to the Victims and more generally.  For example, in one filing, the defendant described the Victims as "jewish white people" and then described them as "horrible people." (GX 1).  In a separate filing, the defendant stated: "This is my Bible!  Hail Hitler.  White Power!  Get the Jew out of probate court.  Throw them down the well." (GX 5).

- *Third*, both death threats against the Victims that underlie the Indictment include antisemitic language.  The December 2022 email stated: "And top it off – I actively hate Jews now.  Seriously.  Hate them and you.  I understand why the Nazis wanted you people dead now – and wish they had finished your people off cause you fucker need to be dead and rid of the earth.  Ugh disgusting." (GX 111).  Similarly, in the January 2023 death threat, the defendant concluded his email stating: "Die you nasty jew fucks." (GX 117).

- *Fourth*, the defendant's threats against other people often targeted Jewish people, (*see, e.g.*, Nov. 28, 2023 Tr. at 173:3-11; *id.* at 180:23-181:1; *see also id.* at 167:20-171:10), and included antisemitic language.  Several emails admitted as Government Exhibits at trial were littered with references to "Jews" and "Kikes" and referred to Jews as "disgusting" and "corrupt." (*See, e.g.*, GX 102, GX 114A, GX 116, GX 120).  The defendant also wrote Jews were "finally getting justice that is welcomed death," (GX 120), and told email recipients to "go to Auschwitz" to obtain "more empathy" and "see your ancestors plight and destruction at the hands of another." (GX 102).

In addition to the material admitted at trial, the Government's investigation identified several additional emails from the defendant that include equally disturbing antisemitic language, including death threats targeting judges in Texas whom the defendant believed to be Jewish.  As reflected in the above, the defendant's repeated targeting of Jewish people and use of antisemitic language demonstrate that he selected the Victims because of their actual and perceived religion.  *See United States v. Cromitie*, 2011 WL 2693293, at * 7 (S.D.N.Y. June 29, 2011) (finding support for the application of § 3A1.1(a) where trial evidence included defendants making antisemitic remarks such as "[Jews are] the most wickedest people that Allah has created" and "These fucking Jews get me sick").

> ii.  **The Court Should Impose a Sentence of 30 to 37 Months'
>       Imprisonment**

The Government respectfully submits that a sentence within the applicable Guidelines range of 30 to 37 months' imprisonment is appropriate and necessary in light of all the sentencing factors in Section 3553(a).  Such a sentence would be sufficient but not greater than necessary to accomplish the goals of sentencing in this case.

*First*, the nature and seriousness of the offenses warrant a Guidelines sentence.  The defendant's words were undeniably terrifying death threats.  The defendant described, with chilling precision, his plans to track the Victims down at their workplaces, put "bullets in the heads" of the Victims' co-workers, and murder the Victims with guns, pipe bombs, and other materials.  In addition, the defendant sent the Victims photographs of the types of weapons he would use to kill them, used vitriolic and hateful language like "I want you dead" and "Die you nasty jew fucks," and incorporated specific and personal details about the Victims, including one Victim's address information, relatives, and phone numbers and information about the other Victim's partner and child.  Taken together, it is readily apparent that the defendant's conduct toward the Victims was intended to—and did—upend the lives of the Victims.  (*See, e.g.*, PSR ¶ 20 (defendant admitting at his change of plea proceeding: "When I sent the emails, I knew that they would be viewed as threats.  I know what I did was wrong . . .")).

Moreover, as demonstrated at trial and detailed in the PSR, the defendant's conduct goes far beyond the two emails he sent the Victims.  In his filings in the Probate Case, the defendant harassed, defamed, and ultimately threatened not only the Victims in this case, but hundreds of other people and entities, including his former attorneys and their law firms, former employers, members of the educational institutions he previously attended, employees at a hospital that had previously treated his ill mother, judges, and other government officials.  Then, through his barrage of emails sent in December 2022 and January 2023, as well as during other time periods, the defendant continued to instill fear and cause chaos for countless other individuals, their families, and their colleagues.

The defendant's conduct caused real harm to real people.  As a result of the defendant's actions, the Victims, as well as the other recipients of his threats, lived in fear for months.  ██
██████ testified that the emails "shock[ed]" him and "caused a lot of panic." (*See* Nov. 27, 2023 Tr. at 71:5-12 (explaining that the December 23, 2023 email "generated a meaningful amount of concern for my safety and my family's safety"); *id.* at 79:15-80:4 (stating that the January 2023 death threat was "unbelievably disturbing" and caused ██████████ to "rethink coming in and out of work" and "in and out of my apartment")).  Another one of the defendant's victims, a former intake attorney at the California State Bar, stated that she felt "alarmed," "uncomfortable," and "unsafe" by a threatening email she received from the defendant telling her and others to "go to Auschwitz," which she "took [] as a red flag that this could be someone who might commit an act of violence."  (Nov. 28, 2023 Tr. at 259:20-262:22).  Additional victims expressed in victim-impact letters to the Court that the threats "changed their lives" and that their families "live in constant fear."  (*See* Exhibit A, filed under seal).  As the Court has learned from these victims, recipients of the defendant's emails moved from their personal residences, relocated their families, hired security personnel, and changed or ceased their employment.

*Second*, the need for the sentence to reflect the seriousness of the offenses, promote respect for the law, and provide just punishment for the offenses militate in favor of a Guidelines sentence. The defendant's antisemitic rants and threats of physical harm and death towards the Victims, and many others, caused them—and their families and colleagues—immense and incalculable fear, emotional distress, and anxiety. In addition, after failing to accept any responsibility for his crimes before trial, the defendant required the Victims, and others to whom he sent horrific, antisemitic death threats, to endure the work that is required to prepare for, and for certain individuals, to travel from other jurisdictions and testify at, the November 2023 trial. Those testifying victims, and those slated to testify, also had to endure receiving, or preparing to receive, questions posed to them directly by the defendant—the person who had wreaked so much havoc on their lives. For each of these reasons, a Guidelines sentence is appropriate to account for the seriousness of the offenses, promote respect for the law, and provide just punishment for the offenses committed by the defendant.

*Third*, a Guidelines sentence is also needed to deter the defendant from future criminal conduct and to protect the public from further crimes of the defendant. The defendant's death threats targeted individuals with whom he had personal grievances—former colleagues, former lawyers, medical staff, judges, and the like. From behind a computer screen, the defendant acted on his anger and hatred by sending his targets graphic, horrific descriptions of how he would bring about their death. This conduct was consistent, widespread, calculating, and callous. While he has admitted to sending death threats to the Victims, after the trial was well underway, the defendant did not even attempt to present this Court with mitigating factors or any statement of remorse for the consequences that resulted from his actions toward the Victims, let alone the others who were targeted by his antisemitic death threats and hateful communications. Given the extent of harm caused by the defendant, his unwillingness to acknowledge his offenses and misconduct even after pleading guilty, and his lack of any statement of remorse at this stage of the proceedings, a custodial sentence within the Guidelines range, followed by three years of supervised release, is necessary to both deter the defendant from engaging in additional serious criminal conduct in the future and to protect the public from further crimes of the defendant.

*Fourth*, the need to promote general deterrence weighs strongly in favor of a sentence within the Guidelines range. In 2022, the Anti-Defamation League found a 36% rise in antisemitic incidents from the prior year,[1] and a 140% increase in 2023, a record high since the organization began keeping track in 1979.[2] A Guidelines sentence will send a message that threats motivated by bias and hatred will not be tolerated.

*Finally*, the Government acknowledges each of the mitigating circumstances reflected in the PSR, including the defendant's childhood abuse, substance abuse, and mental health challenges, among other things. (*See, e.g.*, PSR at 22). In particular, the Government does not

---

[1] Anti-Defamation League, *Audit of Antisemitic Incidents 2022*, March 23, 2023 (available at: https://www.adl.org/resources/report/audit-antisemitic-incidents-2022).

[2] Anti-Defamation League, *U.S. Antisemitic Incidents Soared 140 percent in 2023 – Breaking All Previous Records*, April 16, 2024 (available at: https://www.adl.org/resources/press-release/us-antisemitic-incidents-soared-140-percent-2023-breaking-all-previous).

Hon. J. Paul Oetken                                                                                      Page 9
April 19, 2024

dispute that the defendant appears to have a lengthy history of mental health conditions, which continue at present and likely played some role in his criminal conduct. However, the defendant's mental health history, like his personal history and characteristics overall, must be balanced against the other Section 3553(a) factors, all of which weigh heavily in favor of a Guidelines sentence. On balance, the incredibly serious nature of the instant offenses, the need for specific and general deterrence, and the need to promote respect for the law, and to protect the public from further crimes of the defendant, all support the imposition of a sentence within the Guidelines range.

## Conclusion

For the reasons set forth above, the Government respectfully submits that the Court impose a sentence within the applicable Guidelines range of 30 to 37 months' imprisonment.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

by:  _____
Jamie E. Bagliebter
Diarra M. Guthrie
Assistant United States Attorneys
(212) 637-2236 / 2463

cc:      Defendant Jeremy Joseph (*pro se*)