O4N3JOSS

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4          v.                          23 CR 68 (JPO)

5  JEREMY JOSEPH,

6                  Defendant.

7  ------------------------------x    Sentencing

8                                     New York, N.Y.
                                      April 23, 2024
9                                     11:00 a.m.

10

   Before:

11
                        HON. J. PAUL OETKEN,
12
                                          District Judge
13

14                        APPEARANCES

15 DAMIAN WILLIAMS
        United States Attorney for the
16      Southern District of New York
   JAMIE BAGLIEBTER
17 DIARRA GUTHRIE
        Assistant United States Attorneys
18
   JEREMY JOSEPH
19      Pro Se Defendant

20

21

22

23

24

25

O4N3JOSS

1          THE DEPUTY CLERK:  United States of America v. Jeremy

2   Joseph.

3          Starting with government, counsel, please state your

4   name for the record.

5          MS. BAGLIEBTER:  Good morning, your Honor.  Jamie

6   Bagliebter for the government, and with me at counsel's table

7   is AUSA Diarra Guthrie.

8          THE COURT:  Good morning.

9          MR. JOSEPH:  Jeremy Joseph, pro se.

10          THE COURT:  Good morning.  You all can remain seated.

11          Today we're scheduled for a sentencing hearing in this

12   case.  Mr. Joseph pleaded guilty on November 29, 2023, to two

13   counts of threatening physical harm by interstate

14   communication.  We talked at the last conference about

15   Mr. Joseph having received the presentence report, and having

16   an opportunity to submit any objections, and also whether he

17   had the materials he needed to prepare for sentencing.

18          I did sign an order on April 9 directing former

19   standby counsel at the Federal Defenders to make sure they

20   delivered another copy of the file, relevant documents, to

21   Mr. Joseph at MDC.  And Ms. Lenox informed the Court by e-mail

22   the next day they had sent everything to him and would do it

23   again.

24          So Mr. Joseph, let me start by asking you if you've

25   received everything you need in terms of case-related

1   documents.

2        MR. JOSEPH:  So, update, no, I have not.  With that

3   said, I'm fine with proceeding with sentencing.  There's still

4   materials that I've not received.  When we last had -- when we

5   last were in court, I didn't have my legal notebook.  I'm not

6   sure how it got lost from MDC to here.  But I was able to draft

7   out the motions again that I was planning on submitting last

8   time.

9        I still have not received the transcripts of all the

10  proceedings.  This wouldn't just include the trial and

11  pretrial, but also the transcripts starting from day one when I

12  first came to court.  I need that for current and also future

13  proceedings.  I also have similar charges also in Eastern

14  Texas.  I have not received an update on that.

15       The second is motion to unseal this case.  I've

16  actually been talking to a few legal nonprofit groups,

17  including a journalist, and one thing that would help in terms

18  of getting some of these things going is actually unsealing the

19  case just for legal transparency.

20       And also, I did receive some materials from the

21  Federal Defenders.  Once again, the file is incomplete.  I've

22  made a motion for sanctions against Federal Defenders, just

23  because they haven't applied, as well as an exhibit outlining

24  all the materials I do need.  This would include work product,

25  communication, subpoenaed materials, as well as legal materials

1   that I was supposed to receive from lawyers that I just never

2   got.

3           With that said, I want to submit the motions.

4   Separate from that, I'm fine proceeding with sentencing.

5   Yesterday I got the final PSI.  There still seem to be some

6   things that were outstanding, but I got the chance to go over

7   the materials.  Right now I am not going to be objecting to

8   anything and I'm fine just getting it over with.

9           THE COURT:  Getting what?

10          MR. JOSEPH:  Getting the sentencing over with.

11          THE COURT:  So, couple things.  First of all, you

12  haven't sent a written submission relating to sentencing, have

13  you?

14          MR. JOSEPH:  I have not.

15          THE COURT:  Do you want to do that?  I can give you

16  time to prepare one if you'd like.

17          MR. JOSEPH:  That's okay.  I do have an affidavit for

18  designation.  I want to be designated at Fort Dix.  There's a

19  couple reasons.  It's got, from my understanding, jail

20  programming that fits my needs, and its close proximity to

21  friends that can visit.

22          But, outside the motions and the affidavit to be

23  designated to Fort Dix, I think I'm good and I can submit these

24  things formally to the Court.

25          THE COURT:  You referred to a motion.  What's the

1    motion?

2         MR. JOSEPH:  Yeah, there's three motions and I can

3    hand them over to the marshal who can give them to you and I

4    can file them in court.  Right.

5         Motion to unseal the case, motion for the transcripts

6    of all proceedings, and then the motion for sanctions against

7    the Federal Defenders for not complying with the order to

8    provide my case file.

9         THE COURT:  Okay.  Do any of those motions or anything

10   else you indicated you haven't received relate to sentencing?

11   Is any of that anything you think would be helpful for

12   sentencing?  Because if so, we can put this off.

13        MR. JOSEPH:  No.  So, I think it could be relevant,

14   but I don't think it's critical where it would change anything.

15   So I outlined things that are outstanding from the case file

16   that I've not received, but these are motions that can be ruled

17   on and are separate from sentencing.  Like, the motions that I

18   am submitting today originally were supposed to be submitted

19   last time I got to court.  The marshals aren't sure where my

20   legal notebook went.  Even when I got back to MDC, they didn't

21   have it, so I redrafted them again.

22        THE COURT:  So the case is not under seal.  There are

23   certain -- the case is not under seal.  The case is public on

24   the docket.  There are certain redactions in certain filings.

25        MR. JOSEPH:  Right.  For the protective order.

1          THE COURT:  When you say under seal, you mean the

2    redacted portions?

3          MR. JOSEPH:  Well, think that was removing the

4    protective order, but we already addressed that.  From my

5    understanding the indictment was originally sealed, and so some

6    information wasn't available to the public.  If it's unsealed

7    as of today, then the motion here isn't necessary.

8          THE COURT:  It is unsealed.

9          MS. BAGLIEBTER:  That's correct.

10         MR. JOSEPH:  So then it would be the motion for the

11   transcripts of all proceedings.  I still don't have those.  And

12   I was hoping to get that directly from the Court, given I've

13   been unable to get those transcripts from the Federal

14   Defenders.  Nor do I know if the Federal Defenders actually

15   have them in their possession.

16         THE COURT:  All right.  So, my first question is

17   whether you want those for sentencing.  Because the purpose of

18   today is to determine an appropriate sentence, and I want to

19   give you a chance to address the issues that pertain to

20   sentencing.  And if you think you need any of those transcripts

21   or other documents, I'm happy to put this off and give you a

22   chance to review that.

23         MR. JOSEPH:  No.  So once again, I want to reiterate

24   I'm fine proceeding to sentencing.  I just want future legal

25   proceedings as well as current, because it will be helpful.  I

1    do want the transcripts as well as actually all the filings

2    that have happened in the case as well, though weren't included

3    in the case file.

4              THE COURT:  Then I also want to address the issue of

5    objections to the draft presentence report.  So under Rule 32

6    of the Federal Rules of Criminal Procedure, the probation

7    officer must give the presentence report to the defendant at

8    least 35 days before sentencing, unless the defendant waives

9    that period.  So do you remember when you first received the

10   presentence report?

11             MR. JOSEPH:  I received it about maybe two-and-a-half

12   weeks ago, but I recall when we came to court last time that I

13   waived the time requirements for receiving the PSI as well as

14   sending an objection.

15             THE COURT:  And again, the purpose of that is

16   obviously the -- you've now read the presentence report, right?

17             MR. JOSEPH:  It was delivered to me.  Just to be on

18   the record, I received it yesterday.  Prior to recall, I was

19   given about five minutes to go through it.  I was not -- I'm

20   not able to hold onto it.  So I was able to review it, there

21   didn't seem to be any changes from the draft.  So at this point

22   I have no objections.

23             THE COURT:  But when you saw the initial draft, were

24   you able to have enough time to read it?

25             MR. JOSEPH:  I glanced through it.  It didn't look

1    like there were any changes from the draft so, yeah, no

2    objections.

3                THE COURT:  But just to be clear, have you read it?

4    Do you need more time to read it?

5                MR. JOSEPH:  No, I don't need more time.

6                THE COURT:  And again, you have a right to have 35

7    days before sentencing with the presentence report.  Do you

8    want that additional time?  I'm happy to give you that

9    additional time.

10               MR. JOSEPH:  I've waived the time requirement.

11               THE COURT:  Do you --

12               MR. JOSEPH:  And I don't want the time.

13               THE COURT:  You don't want the time.  Same with

14   objections.  Are there any objections you want to make orally

15   today or in writing?

16               MR. JOSEPH:  Not right now.

17               THE COURT:  Anything the government wants to add sort

18   of preliminarily about these issues?

19               MS. BAGLIEBTER:  No, your Honor.  I think the Court

20   has sufficiently inquired of the defendant that he has had the

21   opportunity to read and review the PSR.  To the extent, while

22   there may not be changes between the initial and the final PSR,

23   of course the final PSR includes additional information

24   including probation's recommendation.  So, if the defendant has

25   not had sufficient time to review that piece of information,

9

4N3JOSS

perhaps we could either give him that time now or confirm that

that's okay.

             THE COURT:  So, the final version, last few pages is a

recommendation section from the probation department.  And they

recommend a particular sentence.  In this case they recommend a

sentence of imprisonment of 30 months, which is the bottom of

what they regarded as the guideline range, as well as 3 years

of supervised release.  And then they had an explanation of

that.

             Did you have a chance to see that?

             MR. JOSEPH:  I did.

             THE COURT:  Do you need any additional time to go over

that?

             MR. JOSEPH:  No, I don't.

             THE COURT:  Do you feel okay today to proceed with

discussing issues relating to an appropriate sentence?

             MR. JOSEPH:  I do.

             THE COURT:  I do find the defendant has waived the

time requirements of Rule 32 with respect to the presentence

report, that he's chosen not to file written objections and a

written submission relating to sentencing.

             So we'll go forward with sentencing today, which I

believe is the defendant's wish.  I asked him about objections.

             I'll ask the government.  Ms. Bagliebter, does

government have any objections after reading the presentence

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   report?

2          MS. BAGLIEBTER:  No, your Honor.

3          THE COURT:  So, I adopt the facts set forth in the

4   presentence report as my findings of fact for sentencing, which

5   findings must be made by a preponderance of the evidence at

6   sentencing.  Of course I've reviewed the presentence report

7   with the addendum and sentencing recommendation, final version

8   dated April 16, 2024, the government's submission dated

9   April 19, 2024, and I've also read the two days of trial that

10  we had, the transcripts of that, and the allocution of the

11  defendant when he pled guilty on November 29, 2023.

12         So the starting point in sentencing is the sentencing

13  guidelines, which is a base offense level on one side and a

14  criminal history category on the other side.

15         Just to be clear, Mr. Joseph, you're familiar with the

16  sentencing guidelines?

17         MR. JOSEPH:  I am.

18         THE COURT:  Have you seen this chart?

19         MR. JOSEPH:  I have.

20         THE COURT:  The chart has the criminal history

21  category on one side and a number on the other side, which is

22  the offense level.  So, the first thing I need to do is to

23  calculate what the right offense level is.  Now, the

24  government's submission goes through and agrees with the

25  presentence report calculation.  I think I have one question

O4N3JOSS

1    about that.

2         The base offense level is 12 under Section 2A6.1 of

3    the guidelines, given this offense.  Because two or more

4    threats were involved, there is an increase of two points under

5    2A6.1(b)(2).

6         And then the next question is under 3A1.1(a), is there

7    an additional three points which applies if the Court finds

8    beyond a reasonable doubt that the defendant intentionally

9    selected the victims because of their religion or actual or

10   perceived religion in this case.  And I know the government

11   explained their view that those three additional points should

12   be added.  Anything you want to add on that?

13        MS. BAGLIEBTER:  No, your Honor.  We are happy to

14   answer any of the Court's questions with respect to that issue,

15   but we do think the enhancement applies here.

16        THE COURT:  Mr. Joseph, do you want to address that?

17        MR. JOSEPH:  I don't.

18        THE COURT:  So I will ask the government questions

19   about that.  That is known as the hate crime enhancement.  And

20   it's certainly true the threats in this case involved

21   antisemitic language.  The two victims at issue in this case

22   were Jewish, and there was antisemitic language in the

23   threatening communications.

24        However, I'm not sure I can find beyond a reasonable

25   doubt that the defendant selected the victims because of their

religion, which is a very specific definition of hate crime in
the sentencing guidelines, and it also requires a finding
beyond a reasonable doubt, which is unlike most other
provisions of the guidelines.

And the reason I say that is because when you look at
all the evidence in the case, which I reviewed, there is
antisemitic language to others, and the people who received
these threats were people that the defendant had a connection
with. They're people he knew. The Morgan Stanley people he
worked with a decade ago are the victims in this case. There
is antisemitic language sent to the Texas probate judge who he
obviously had a connection to through the case out there.
There's also lots of other hateful language, white trash, you
know, derogatory language based on a Latino status, the N word
multiple times, homophobic language. So there's lots of kind
of undifferentiated broad hateful language, and that is
disturbing and I think it's culpable conduct and I think it's
harmful in the way that hate speech is harmful.

But on the question whether he selected the victims
because of their status as Jewish or perceived status as
Jewish, I don't know that I can say beyond a reasonable doubt
that he did, as opposed to sort of opportunistically coming up
with hateful language about the various people, in many cases
who turned out to be victims, but who were essentially people
he had a connection to.

1          So that's the question I have, if you'd like to

2     address it.

3          MS. BAGLIEBTER:  Thank you, your Honor.  I would like

4     to address it.

5          I think what your Honor is grappling with makes sense

6     and I appreciate the perspective of the Court.  I think there

7     are a few problems with seeing the analysis and seeing the

8     enhancement of a hate crime or seeing the application of the

9     hate crimes enhancement limited in the way that you suggest.

10    Here's the things that I think are too limiting.

11         One, by saying that the hate crimes enhancement does

12    not apply because Mr. Joseph knew these individuals suggests

13    that you can only be selecting your victim -- it has to be a

14    stranger that you see wearing some indication or advertising in

15    some way or because of their color of their skin, showing they

16    are a member of this protected class, and you target them only

17    for that basis.  That's not my understanding of what the

18    standard is.  It does need to be because of their membership in

19    that protected class, here as members of the Jewish faith or

20    the perception that they are.  But it doesn't need to be the

21    only reason.  And in most places in our law where we have a

22    because standard or a but-for standard, it's not the only.

23    It's one, it can be one, it can be a significant motivating

24    factor, but it's not the only.

25         And so here, the question is not to me whether they

1    were selected only because of their religion or because he had

2    these grievance against them.  But rather, did the grievances

3    that he have elevate to the point where they became targets of

4    these threats, in part because of their religion and his hatred

5    towards that group.

6            And I think what the Court has to look at to make this

7    beyond a reasonable doubt finding is the defendant's own words

8    and the frequency of those words.  And so, when the defendant

9    is targeting them, he is using their membership or perceived

10   membership in this group to elevate the harm that he is

11   bringing to them.  And so the Court has to wonder, well, why

12   did these victims -- why did these people who have wronged him

13   receive these threats.  And I think he's telling the Court why

14   they received these threats.  His own words, what he chooses to

15   say to them, is what is going through his mind at the time he's

16   sending these death threats.

17           As we laid out in our submission, he identified these

18   individuals as Jewish from when he was first complaining about

19   them years before the death threats happened.  And then his

20   grievance against them maintained and festered, and now we are

21   talking 12 years later.  Why come back to these people?  And if

22   he was devoid of this hate towards this group, would these

23   people still be in his mind?  Would he still be saying the

24   things that he's saying?

25           Look, we can't go inside of his mind.  He's had the

1    opportunity to represent otherwise to the Court and has not.

2    So we have to look at what we have.  And we have over and over

3    again him choosing to use hateful language about their Jewish

4    identity to attack them.

5             So, I don't know why he's still thinking about them

6    12 years later.  But it looks to me, based on the words that

7    he's saying, over and over again, that it has to do with their

8    Jewish identity that they have stuck out in his mind.  And that

9    suggests that, in part, because they are Jewish, he felt that

10   they -- they remained in his mind, his grievance against them

11   remained in his mind, and they were targeted in this instance.

12            Then your Honor also mentions, well, it's not just

13   them that received these threats, but it's all these other

14   individuals that he also uses antisemitic language.  To me,

15   that is evidence in favor of the fact that he was selecting

16   victims, not just the statutory victims in this case, but part

17   of his broader pattern of conduct, he was selecting victims

18   based on their membership in these groups, and specifically a

19   Jewish identity.

20            THE COURT:  But, sorry to interrupt.  Those are all

21   very good points, but there is also counterexamples where

22   people, like DCVC, if that's the name of the entity, colleagues

23   there where it was just a white non-Jewish woman, he would use

24   a word like white Barbie or something.  That's why I say

25   opportunistic.  It feels like he had grievances of various

O4N3JOSS

1    people, and when there was a pertinent hateful characteristic,

2    a relevant characteristic as to which he could use hateful

3    language, he did.  But were they selected because of that

4    status.

5          MS. BAGLIEBTER:  On DCVC in particular, it is worth

6    noting one of his primary targets was Jewish and was receiving

7    threats containing antisemitic language.

8          Now, without a doubt, there are other people who come

9    into the orbit of his threats, that if they're part of another

10   protected class, they get a different piece of hateful

11   language.  And if not, they get something more generic like a

12   white Barbie.  It is not like his hate is exclusively to people

13   in these classes.  That's not the standard.  The standard is

14   not did he send death threats to anyone else.  It's were these

15   victims in some way selected because of their protected class.

16   I do think we see a frequency of Jewish targets in his

17   behavior.

18         Also in some of the filings that are more generic,

19   facing hundreds of people, you see the heil Hitler language,

20   you see the language that is antisemitic in nature and being --

21   which is sort of elevating the antisemitic language over some

22   of the other threats that we see.

23         Now, to go to your other point, your Honor, which I

24   think you touch on here, yes, he is using hateful language

25   about other minority groups as well.  But I don't think that

that is mutually exclusive to him selecting a victim because of

their identity as part of the Jewish minority.  If there is

wider spread hate towards various groups, various minority

groups, and he's using hateful language towards all of them, I

don't have the research on this, but I think there is probably

some instances where there's sort of co-morbidity for lack of a

better word, and there is hate towards more than one protected

class, and that's conveyed over and over again.

So I don't see that, again, I don't see that as taking

away the idea he is selecting them because of their Jewish

identity, but maybe suggesting that he selects these victims

because of their membership in the Jewish faith, and other

victims because of their membership in other minority groups,

and he feels hate towards that as well or he sends those

messages with those hateful messages.

Look, I appreciate that there is no question that

there is another motivating factor here, which are these

personal grievances he has.  But to ignore the hateful language

that is very focused and antisemitic and repetitive over and

over again, even for victims who weren't in fact Jewish.  For

example, the California intake attorney was not, but she says

she is often mistaken for a Jewish person from her last name,

and it was clear from those e-mails that there was a focus with

the references to Auschwitz, the questions about whether his

previous lawyers he had worked with was Jewish, there was this

pervasive discussion of an identity with the Jewish faith that

comes up over and over again, that we see sort of elevated

above with many of the victims that he's targeting, actual or

perceived.

          And so I do think it meets the beyond a reasonable

doubt standard even though -- because otherwise, any time you

had another reason, or you had a grievance against someone that

maybe was more impactful on you because of your hatred towards

this member of this protected class, you would not be able to

apply the enhancement.

          THE COURT:  I don't know if that's true.  I take your

point that the hateful language should not be ignored, and I'm

not suggesting it should be.  I'm just wondering whether this

situation establishes beyond a reasonable doubt that they were

selected because of their status as Jewish.

          And I guess it seems to me the standard might be

something like the counterfactual, consider that he had exactly

the same situation, he had a difficult experience with them a

decade ago working at Morgan Stanley, and imagine neither one

was Jewish, but everything else in the world was the same.  And

he had bad experience there, later says he has PTSD about it,

and then would he, in the context of all these communications

he's sending at this time, would he have selected them to

receive some of them?  Now, admittedly, they would be different

because they wouldn't perhaps have the antisemitic language.

1    But if they still had been selected, then I'm not sure 3A1.1

2    applies.

3             MR. JOSEPH:  Can I interject because you're talking

4    about me.

5             So, one, I think this is a lot of speculation.  Two

6    is, I think we are going to put things on the record, just make

7    sure they're correct.

8             While I did have issues at Morgan Stanley with these

9    two employees, the references even later are usually through

10   FBI intakes, notes that had been provided to the FBI.  Because

11   not only was my identity stolen, but I was receiving threats

12   myself.  And every time the FBI asked me, either on the phone

13   or in person, these people who are comprising your accounts or

14   targeting, who do you think could be the potential assailants.

15   I was at a loss, and I said I think the only people that I have

16   a major issue with in the past were these two people.

17            In those intakes you don't see any reference about the

18   Jewish faith, and any of the e-mails that actually I had with

19   these two victims, there was never any mention of their Jewish

20   faith as well.

21            And I'm thinking of what else the prosecutor has said

22   that references me referencing them about them being Jewish

23   over the last 13 years, I don't see it.  I never got the entire

24   case file from Houston.  I never got any of the e-mails from

25   Morgan Stanley as well as the HR records of David Friedman and

O4N3JOSS

1    Sara Slifka.

2         So while you can make an argument, I at least wish you

3    would stay within the bounds of it being fact.  While I pled

4    guilty to these two e-mails, you are talking about a lot of

5    things that are referencing other e-mails which I don't know if

6    those are charges, but you can't say that because I've pled

7    guilty to these e-mails that I'm now responsible for

8    everything.  The things regarding probate court, I wanted to

9    subpoena him.  I was unable to.  I didn't even get all the

10   materials from that probate court.  I had a list of witnesses

11   that I wanted from the court, and I want to remind the Court I

12   wasn't able to have any witnesses.  I had a list of 30 people

13   that I was hoping to subpoena, some including Jewish people who

14   are my friends and who could have accounted for things I've

15   said and done, and I had not one.

16        And considering I had this prepared three months ago

17   and I had zero witnesses, with subpoenas, there is just a lot

18   of things missing.  So to speculate on things that aren't

19   factual, I think is just jumping ahead.

20        THE COURT:  Let me back up.  You talked about FBI

21   reports.  We are not talking about FBI intake reports.  We are

22   talking about the e-mails that you pled guilty to.  And one of

23   them says --

24        MR. JOSEPH:  Right.  You are also referencing --

25        THE COURT:  -- top it off, I actively hate Jews now.

O4N3JOSS

1    Seriously hate them and you.  I understand why the Nazis wanted

2    you people dead now.

3              Did you write that?

4              MR. JOSEPH:  No.

5              THE COURT:  You pled guilty to it.

6              MR. JOSEPH:  I did.

7              THE COURT:  So you're saying you weren't guilty?

8              MR. JOSEPH:  I didn't have any witnesses.  Right.  You

9    said it was okay not to have any witnesses.

10             THE COURT:  Well, we never got to your case because --

11             MR. JOSEPH:  I had no witnesses.  You stopped Monday.

12   You said I could not call any more witnesses.

13             THE COURT:  I already accepted your guilty plea.  You

14   admitted to that.

15             MR. JOSEPH:  Fine.

16             THE COURT:  So, do you want to respond to the specific

17   issue about selecting people because of their religion?

18             MR. JOSEPH:  No.

19             THE COURT:  Okay.

20             MS. BAGLIEBTER:  So your Honor, I would just say we

21   need to be limited to what's in the record, what's in the PSR,

22   what the government can proffer to.  So claims of what may or

23   may not have been included in FBI intake is not within the

24   scope of what the Court should be considering here.

25             What we can consider is what we know from the e-mails,

1    and as we said in our submission, between things that he's said

2    to his close friends who have testified in court, between the

3    language in the probate court filing, which is what starts this

4    in the summer of 2022, which includes the antisemitic language,

5    through the death threats to these particular victims, and in

6    the broader course of conduct.

7          So in every category of evidence in this case, we see

8    the pervasiveness of this antisemitic language.  So to address

9    the Court's counterfactual of if these individuals weren't

10   Jewish, would they have still been a target of his ire 12 years

11   later, I think looking at what we know, I think the answer to

12   that is no.

13         He claims to have the PTSD, but remember the record is

14   devoid of actual things that could have reasonably justified

15   that grievance.  So, he was terminated from his employment, but

16   that was it.  And there was no evidence in the record of them

17   targeting him in any way, or keeping him from other

18   professional opportunities --

19         MR. JOSEPH:  -- I did flag issues at Morgan Stanley

20   and discrimination --

21         MS. BAGLIEBTER:  If I may continue uninterrupted and

22   then of course Mr. Joseph can have an opportunity to respond.

23         Then with DCVC and individuals he targeted, which one

24   of them primarily was an individual who was Jewish, you have

25   what happens is he gets this review, he gets this review as

1    Mr. Hamer testified to, which was sort of commonplace for

2    people who needed some assistance, and then some individuals

3    get really drastically targeted.  So, there is not a reasonable

4    basis for the kind of decade-long hold of grievances, so we

5    can't look to that as an explanation for why these particular

6    individuals are held on to.

7              And on the other side of the ledger we have the

8    language that he's using over and over again.

9              So I do think that that shows beyond a reasonable

10   doubt.  And had we continued before the jury, I think the jury

11   would have been looking at this, and of course now it's in the

12   Court's view to propose it.  But, we are, without the defendant

13   stating otherwise, and even with that I think we would have to

14   question what the value of that was, but this is what we have

15   to rely on, and this is a record beyond a reasonable doubt that

16   the victims were in part identified and selected because of

17   their actual or perceived membership in this class.

18             THE COURT:  I will say, we did some research on this,

19   and there is not much that talks about the mixed motive issue

20   or what exactly the standard is.  The courts seem to apply the

21   actual language which is they were selected because of the

22   prohibited characteristic.  And there is one case *Carlineo*,

23   where the Second Circuit refers to what District Judge Geraci

24   did, but doesn't approve it or reject it, but just notes that

25   the Court rejected the three-level hate crime motivation.  And

1   this was threats to Congresswoman Omar, and the judge said that

2   Carlineo's use of the word Muslims -- did use the word Muslims,

3   but could not find beyond a reasonable doubt that the defendant

4   targeted her on account of her Muslim religion, even though she

5   used the word, as opposed to political beliefs.  That's an

6   example.

7           And I think you make very good points.  I think if the

8   standard were preponderance, it might be different.  I don't

9   think I can find beyond a reasonable doubt that they were

10   selected because of that.  I think you make a very good point.

11   10 years earlier, he had grievances, it was a bad experience,

12   he might have still targeted them, he might not have, but I

13   don't think I can say that beyond a reasonable doubt their

14   religion made a difference.

15           I will say that affects the guidelines, but it doesn't

16   affect culpability.  I think it would be totally reasonable if

17   3A1.1 were written with a broader notion of a hate crime

18   enhancement that wouldn't be based solely on selecting the

19   victims because of that.

20           So, Mr. Joseph, anything you want to add on that

21   point?

22           MR. JOSEPH:  No.

23           THE COURT:  Anything else on the guidelines?

24           MR. JOSEPH:  No.

25           THE COURT:  So for the reasons I've just explained, I

1    think it's a close question, but I think given that the

2    standard is beyond a reasonable doubt, I cannot find beyond a

3    reasonable doubt that the defendant intentionally selected

4    these two victims because of their religion.  And therefore,

5    the adjusted offense level is 14, but after a multiple count

6    adjustment, it becomes 16.  The criminal history of course is

7    I, and that results in a guideline range of 21 to 27 months

8    under the guidelines.  Of course that's advisory, it's not

9    binding.  Probation recommends 30 months, but that's on the

10   assumption that a different guideline range applies.

11           So I'd like to give each of you an opportunity to

12   speak.  I've read the government's submission and obviously the

13   presentence report.  And anything the government would like to

14   add?

15           MS. BAGLIEBTER:  Yes, your Honor.  I think I'll start

16   with the point that your Honor raises, which the hateful

17   language and the hateful language targeting members of the

18   Jewish community does still have relevance from a 3553(a)

19   factor, and that's important to think about.  Because the hate

20   crime enhancement was created, and perhaps your Honor is

21   correct that it could have been written in a lot of different

22   ways, but it still reflects an attitude that crimes that target

23   a particular group of people have increased harm, and that

24   needs to be accounted for in fashioning a sufficient but not

25   greater than necessary sentence.

1    And in this case, the hateful language against the

2  Jewish community as well as other communities, as your Honor

3  noted that are targeted here, not only do the selected victims

4  feel that pain, but other people who are members of those

5  groups who see the filings on the e-filing system or who are

6  made aware, colleagues of theirs who are made aware that these

7  e-mails come through the system targeting their place of work

8  and are focused on the membership of being a part of the Jewish

9  community, that's going to impact those people differently.  It

10  makes it scary to walk down the street.  It makes it scary to

11  show your identity.  And Congress has recognized that, and it's

12  a powerful 3553(a) factor.

13    And it's important also in considering the importance

14  of general deterrence, because the harm is so great, and

15  individuals who are going to engage in criminal conduct and

16  link that criminal conduct towards victims or have that

17  criminal conduct related to their victims' membership, even if

18  you don't view it as because of, but related to their victims'

19  membership in a particular religious, racial, ethnic group, a

20  message needs to be sent that that conduct will be recognized

21  as an aggravating factor.

22    A few other things I'd like to highlight in addition

23  to the government's submission, which I know the Court has

24  reviewed.  And the first is I want to talk about the victims

25  again.  Because at sentencing there is often a heavy focus on

1    the life and the circumstances of the defendant, and of course

2    that makes sense.  But the victims are also a really relevant

3    player here.  And in fashioning the sentence, thinking about

4    how a crime has impacted the victim is important to a lot of

5    the 3553(a) factors, including just punishment for the offense.

6        And here, the victims in this case, their lives were

7    completely unended because of absolutely no fault of their own.

8    They had to suffer through months and years of fear, that's

9    permeated their lives and the lives of their family and their

10   colleagues and their neighbors and others.  These death threats

11   are not just a press of a button and it's over.  The ripple

12   effect of the harm that's created when that send button is

13   pressed is really significant.  And so just punishment for that

14   kind of offense would really need to take that into

15   consideration.

16       This happened to these victims for no other reason

17   than they were unlikely enough to have crossed paths with the

18   defendant professionally and have upset him in some way.  And

19   because of that, they've had to take real steps that have

20   changed their lives in terms of protecting themselves and their

21   families and trying to feel safe.

22       Your Honor heard during trial from one of the two

23   statutory victims in the case.  Had the trial continued, the

24   Court would have heard from the other victim.  This was a

25   horrible experience that had really lasting effects for them

1   and the other victims of the defendant's broader pattern of

2   conduct.  They were similarly traumatized by the defendant's

3   conduct.

4           Your Honor heard from the victim from DCVC who you

5   referenced earlier.  He relocated his family.  Think about what

6   a huge -- not just inconvenience, but how afraid you have to be

7   to move your whole family and your life because you don't feel

8   safe.

9           Another one of the government's witnesses who started

10  but didn't finish her testimony, you know, she was expected to

11  testify that she's had difficult time finding stable housing

12  since this has happened.  Because she won't -- she won't live

13  anywhere with her own name.  So she has had to create this

14  whole system of ways to mask her identity, because she feels so

15  afraid.

16          Your Honor, we also had someone slated to come testify

17  who was a prosecutor who loved their job, and after 10 years in

18  the job, quit in part because they felt so overwhelmed by being

19  targeted by the defendant.

20          These are real life-changing events that happened.

21  These victims are never the same.

22          And so, while in some ways the defendant may argue or

23  you could think of this as, oh, it's just these e-mails just

24  get sent and no one takes them seriously.  But they are really

25  being taken seriously, and the reason you know they are going

1  to be taken seriously is look at how egregious the language in

2  these e-mails are.  This is not hyperbole.  It is not puffery.

3  It is specific.

4          You heard the victims testify about what was so

5  terrifying about it was, you know, their pets were mentioned,

6  family medical issues were mentioned, specific things about the

7  offices and where they're located and how they look.  That is

8  terrifying to know that someone is thinking about these

9  personal details about you, and then making these incredibly

10  graphic, horrific, realistic death threats.

11          And so, I know the government talks about it in its

12  submission, but I think it cannot be underscored enough what

13  sits on the other side.  The impact that this has had for the

14  victims.

15          And I've mentioned general deterrence a little bit,

16  but I do think it's also worth mentioning specific deterrence

17  as well and the importance of that.  It is correct that the

18  defendant has pled guilty to his crimes.  But there is no

19  showing of remorse or concern about these victims.  There is no

20  way for the Court to have comfort that the defendant will not

21  escalate his grievances against the next set of people in the

22  same way.

23          And so, from a specific deterrence purpose, I think

24  it's very important for the Court to fashion a sentence that

25  shows if you make a choice like this, these are the

1   consequences that result from it.  Because without that those

2   consequences and without that accountability, I don't think we

3   have any indication that this conduct would stop.

4          So for those reasons and those discussed in our

5   submission, the government thinks that a guideline sentence --

6   and appreciating that the Court has adjusted the guidelines,

7   still believes that a sentence approximately where probation

8   had placed it is appropriate here because this is really

9   serious conduct.

10          THE COURT:  I just wanted to ask one question.  Are

11   there pending charges in other jurisdictions?

12          MS. BAGLIEBTER:  There is a pending federal case in

13   the Southern District of Texas, and when the defendant was

14   arrested, and then he waived his extradition, there was an

15   arrest warrant both from our office and from the Southern

16   District of Texas.  So it is my understanding -- I've reached

17   out to the Southern District of Texas, I don't have an update,

18   but it is my understanding he will have to appear there and his

19   case will now proceed in Texas.

20          I can say that the indictment in Texas, the large

21   majority of -- certainly the statutory e-mails here are not

22   part of the Texas case, of course.  But the e-mails relating to

23   DCVC, the e-mails relating to the California intake attorney,

24   that is also not part of the indictment in the Southern

25   District of Texas case, just to the extent that's relevant to

O4N3JOSS

1    your Honor.

2             THE COURT:  What is relevant?  What does that cover?

3             MS. BAGLIEBTER:  It covers, based on the indictment,

4    it covers a set of e-mails, I believe they were sent on

5    January 22, 2023, so still part of the same time period, the

6    same two-month time period.  It focuses more on the threats in

7    the Harris County probate court system.  It includes, I believe

8    the first count in that case is one of the e-mails that Michael

9    Devitt spoke about which references things in Harris County,

10   but it wasn't a direct threat to Mr. Devitt.  And then there's

11   a threat that was to ABC News and some news outlets in Texas.

12   And then the other ones are very similar in nature, but not the

13   ones that were specifically admitted into evidence at trial.

14            THE COURT:  Is it the same charges?

15            MS. BAGLIEBTER:  Four count of 875(c).

16            THE COURT:  Are there also pending charges in Canada

17   and/or San Francisco?

18            MS. BAGLIEBTER:  So there was a case in Canada, and I

19   think that case is still pending, but I don't know.  I think

20   that they had sort of left it open at the time that he waived

21   extradition and came here.  And in San Francisco it's related

22   to -- it is a non-threats related issue, and it is an arson

23   charge.

24            THE COURT:  That's still open as well?

25            MS. BAGLIEBTER:  I believe so.

1          THE COURT:  Thank you.

2          Mr. Joseph, anything you'd like to add before

3    sentencing?

4          MR. JOSEPH:  No.  Like I said before, I hadn't

5    received the Houston case file.  I realize there is additional

6    charges in Houston.  I realize that the charges were not

7    merged.  So there is another opportunity to be sentenced longer

8    in Houston.

9          THE COURT:  But do you want to argue for what the

10   sentence should be here?

11         MR. JOSEPH:  No.

12         THE COURT:  All right.  And you said you wanted to

13   present some motions?

14         MR. JOSEPH:  Yes, just to file with the court I spoke

15   about earlier.

16         THE COURT:  We can take those.  These don't relate to

17   the sentencing, is that right?

18         MR. JOSEPH:  No.  There is an affidavit for

19   designation at Fort Dix.

20         THE COURT:  Okay.

21         MR. JOSEPH:  But from -- I guess it would be an open

22   question considering I have open charges in Houston, whether or

23   not I will be going to Fort Dix or any other place, or if I

24   would be transferred directly to Houston.  It doesn't seem like

25   the DoJ knows the answer to that.

O4N3JOSS

1    THE COURT:  Do you know anything about the timing, the

2    usual timing of that?

3    MS. BAGLIEBTER:  I don't.  In terms of his

4    designation, I think my assumption base is BOP would not

5    designate him if he was going to be sent to Texas first, and he

6    would go to Texas.  I believe there is a detainer for him, so

7    at the time that he's slated for -- if Texas doesn't writ him

8    to Texas sooner, at the time that he would be set to release, I

9    believe the detainer would have him transferred to the Southern

10   District of Texas.  My expectation is if there is a period of

11   time after today that he's still incarcerated on these charges,

12   that Texas could writ him to Texas sooner and start their case

13   against him there.  And then my assumption is they would

14   designate him after both of those cases had concluded.  But

15   it's possible that BOP would do it differently.

16   THE COURT:  You've asked for a designation to Fort

17   Dix, Mr. Joseph, due to you said programming and proximity to

18   friends.  Is that right?

19   MR. JOSEPH:  Correct.

20   THE COURT:  Have you had mental health treatment while

21   at MDC?

22   MR. JOSEPH:  Right now, I'm a suicide watch companion.

23   THE COURT:  Did you say you are a companion?

24   MR. JOSEPH:  I am a companion.

25   THE COURT:  You are.

1          MR. JOSEPH:  So, I did a general psych review with

2     them.  I was fine with that.  I've done psych reviews with the

3     prison psychiatrist after the arson charge and after my mother

4     died.  And I was experiencing discrimination at DCVC, and then

5     I saw a therapist for about a couple of years before they broke

6     off and I went to Canada.

7          But in general, at MDC I've done the psych review that

8     was a check, and then I became suicide watch companion.

9          THE COURT:  I mean, MDC doesn't have the best

10    programming because it's primarily a pretrial facility.  I

11    would like to have you get the most mental health treatment,

12    both an evaluation and whatever intensive treatment they can

13    give.  I'm not sure what facility has that, but I think some

14    facilities have better programming for intensive mental health

15    treatment than others.  So I was going to make the

16    recommendation that you be designated to a facility that has

17    robust mental health treatment.

18          Is there anything you want to say about that?

19          MR. JOSEPH:  My understanding is Fort Dix does have

20    that as well as programming to get back into the world.

21    There's trauma programming as well as mental health for

22    recovery after trauma.  That's what attracted me to Fort Dix.

23    And then also the close proximity to my friends who can visit.

24          THE COURT:  All right.  Anything else anybody wants to

25    add before sentencing?

O4N3JOSS

1      MS. BAGLIEBTER:  Not from the government.

2      THE COURT:  Anything else, Mr. Joseph?

3      MR. JOSEPH:  No.

4      THE COURT:  In preparing to sentence defendant, I've

5  considered the presentence report, the recommendation of

6  probation, and the statements of the defendant and the

7  government, and I've considered all the factors in 18 U.S.C.

8  Section 3553(a), which is the law that governs sentencing.  And

9  I'm required to consider a bunch of factors:  The nature and

10  circumstances of the offense, the defendant's history and

11  characteristics, and the purposes of sentencing, the need to

12  reflect the seriousness of the crime, to promote respect for

13  the law, provide just punishment, afford adequate deterrence to

14  criminal conduct, protect the public, and to provide any needed

15  training or treatment to the defendant in the most effective

16  manner.  And of course I'm required to consider the sentencing

17  guidelines.

18      I'm ultimately required to impose a sentence that is

19  sufficient, but not greater than necessary, to comply with the

20  sentencing purposes in the statute.

21      The defendant sent death threats to two of his former

22  colleagues in December of 2022 and January of 2023.  These

23  death threats were filled with antisemitic language and other

24  hateful language.  They included personal details about the

25  victims as well as photographs of weapons, and they contained

1    details about how and when he intended to kill the victims.  In

2    the short, these threats were intended to terrify and terrorize

3    the victims, and they did.

4            As Ms. Bagliebter has pointed out very well, I think

5    this was harmful conduct and it was conduct that really did

6    terrify the victims.  This was part of a pattern of threats by

7    the defendant against many other people he had interacted with

8    over the years.  The defendant's conduct caused real harm.  As

9    I said, it terrified the victims and caused immeasurable

10   distress and anxiety, and that was heightened by the nature of

11   the threats, the level of pure hatred, and the detail in the

12   threats.

13           The purposes of reflecting seriousness of the crime,

14   promoting respect for the law, providing just punishment,

15   assuring adequate deterrence, and protecting the public require

16   a sentence that is serious.  As I said, the guidelines call for

17   a sentence of 21 to 27 months.  Certainly not unreasonable,

18   given the seriousness of the conduct here.  If anything, that

19   range may understate culpability in some ways because of the

20   hateful nature of the threatening communications.

21           As I indicated, although I'd found that the hate crime

22   enhancement does not apply, the conduct was more harmful, and

23   the defendant is more culpable, given that the communications

24   expressed bigotry and hate.

25           I'm also required to consider the history and

1    characteristics of the defendant.  He has a history of

2    substance abuse, mental health challenges, and other personal

3    circumstances, including abuses that in some ways are

4    mitigating and may explain why he's in the position he's in.

5        One of the purposes of sentencing is to provide

6    treatment in the most effective manner.  And I think even

7    though I found Mr. Joseph competent to stand trial, competent

8    to represent himself, I do think that he has mental health

9    challenges, and I think that treatment that is intensive and

10   effective is important.

11       I will recommend that he be designated to a BOP

12   facility, Fort Dix or another facility that is able to address

13   appropriate treatment for mental health.  And while getting

14   effective treatment might be more readily available outside of

15   prison, there is no guarantee he'll obtain that treatment.  And

16   in any event, the other purposes of sentencing outweigh the

17   need for treatment in the near future, given the seriousness

18   and nature of the criminal conduct.

19       Ultimately, weighing those considerations, I believe

20   that a sentence of 27 months, which is in the guideline range,

21   is sufficient, but not greater than necessary, to serve the

22   purposes of sentencing, followed by three years' supervised

23   release.

24       I'd like to give the parties a chance to state any

25   legal objection to that sentence before I impose it.

O4N3JOSS

1      MS. BAGLIEBTER:  No objection, your Honor.

2      MR. JOSEPH:  No.

3      THE COURT:  Mr. Joseph, you are hereby committed to

4 the custody of the Bureau of Prisons for 27 months on both

5 counts concurrent.  Following release, you will be on

6 supervised release for 3 years, again, on both counts

7 concurrent, with the following conditions:

8      You will not commit another federal, state, or local

9 crime.  You will not possess or use an illegal controlled

10 substance.  You will submit to one drug testing within 15 days

11 of placement on supervised release, and at least the two

12 thereafter as directed by the probation officer.  You will

13 cooperate in the collection of DNA as directed by the probation

14 officer.

15      The standard conditions are imposed with the following

16 special conditions:

17      You will submit your person, any property, residence,

18 vehicle, papers, computer, other electronic communications,

19 data storage devices, cloud storage or media and effects to a

20 search by any United States probation officer, and, if needed,

21 with the assistance of any law enforcement.  The search is to

22 be conducted when there is reasonable suspicion concerning

23 violation of a condition of supervision or unlawful conduct by

24 the person being supervised.  Failure to submit to a search may

25 be grounds for revocation.

1    You will provide the probation officer with access to

2  any requested financial information.  You will not incur any

3  new credit charges or open additional lines of credit without

4  the approval of the probation officer unless you are in

5  compliance with the payment schedule.

6    You will participate in an outpatient substance abuse

7  treatment program approved by the probation office, which may

8  include testing to determine whether you've reverted to use of

9  drugs or alcohol.  You'll also participate in a mental health

10 treatment program approved by the probation office, and you

11 will continue to take any prescribed medications unless

12 otherwise instructed by the health care provider.

13   You will report to the nearest the probation office

14 within 72 hours of release.  You will be supervised by the

15 district of your residence.

16   I'm not imposing a fine because I find you are not

17 able to pay a fine.  However, there is a mandatory special

18 assessment of $100 for each count, for a total of $200, which

19 is hereby imposed.

20   Mr. Joseph, you pled guilty and I accepted your plea.

21 However, do you have a right to appeal from your conviction and

22 sentence and I want to advise you of that right.  You do have

23 the right to appeal from your conviction and sentence, except

24 to the extent you have waived that right as part of your guilty

25 plea and by pleading guilty.  If you cannot pay the cost of an

O4N3JOSS

1    appeal, you may apply for leave to appeal without payment of

2    any costs.  Any appeal must be filed within 14 days.

3              I'll make a recommendation to the Bureau of Prisons

4    that you be designated to Fort Dix or other appropriate

5    facility that has appropriate treatment, and the BOP makes the

6    ultimate determination.  I can only make a recommendation.

7              Is there anything further from -- I wanted to ask

8    about restitution, if the government wanted to address that.

9              MS. BAGLIEBTER:  Your Honor, there is no restitution

10   at this time.  The victims have been notified, but we have not

11   received any restitution requests.

12             THE COURT:  Anything further from the government?

13             MS. BAGLIEBTER:  No, your Honor.  Because the

14   defendant pled open to the indictment, and there are no prior

15   indictments, there's no underlying indictments or open counts.

16   So no, your Honor.

17             THE COURT:  Anything further, Mr. Joseph?

18             MR. JOSEPH:  No.

19             THE COURT:  Thank you.  We are adjourned.

20             (Adjourned)

21

22

23

24

25